**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL PRESTON and PENELOPE TURGEON, on behalf of themselves and all others similarly situated, | ) ) ) | |
| | ) | No. 22-cv-01777 |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| AMERICAN HONDA MOTOR CO., INC., | ) ) | |
| Defendant. | ) ) | |

**SECOND AMENDED CLASS ACTION COMPLAINT**

NOW COME the Plaintiffs, MICHAEL PRESTON AND PENELOPE TURGEON, and for their Complaint against Defendant, AMERICAN HONDA MOTOR CO., INC. ("AHM"), and on behalf of all other similarly situated Illinois consumers, Plaintiffs state as follows:

**PREFATORY STATEMENT**

1.     Plaintiffs Michael Preston and Penelope Turgeon, both residents of the State of Illinois, bring this matter on behalf of a proposed class of similarly situated Illinois consumers against Defendant AHM.

2.     This matter was originally filed in the Northern District of Illinois (N.D. Ill. Case No. 17-cv-03549) but transferred to the Central District of California (C.D. Cal. Case No. 2:18-cv-0003) upon AHM's motion.  The case was re-assigned to Judge Manuel L. Real and he dismissed Preston and Turgeon's First Amended Complaint.  The Ninth Circuit Court of Appeals reversed in part Judge Real's decision, remanding the matter for further proceedings after finding the Plaintiffs should have been granted leave to amend.

1

3.      The case was eventually re-assigned to Judge Virginia A. Phillips and on April 5, 2022, Judge Phillips granted Plaintiffs' motion to transfer back to the Northern District of Illinois, with the understanding that Plaintiffs' claims would be consolidated with the already pending matter of *Caracci v. American Honda Motor Co., Inc*., N.D. Ill. Case No. 19-cv-2796.

4.      Plaintiffs will be filing a motion to consolidate No. 22-cv-01777 with No. 19-cv-2796.

5.      Upon remand and the transfer back to Plaintiffs' home venue, Plaintiffs now allege the following violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2 ("ICFA").

## JURISDICTION AND PARTIES

6.      Plaintiff Michael Preston is an Illinois consumer, residing in Lake County, Illinois.

7.      Plaintiff Penelope Turgeon is an Illinois consumer, residing in Cook County, Illinois.

8.      Defendant AHM is a corporation engaged in the advertisement, sale, supply, warranty, and distribution of motor vehicles and related equipment and services. AHM supplies its products and services to the public through a system of authorized dealerships and service centers.

9.      Through this authorized network of dealerships and service centers, AHM, (a) markets and sells vehicles on a widespread basis to Illinois residents, and (b) authorizes or rejects warranty repairs on those vehicles throughout the State of Illinois.

10.      AHM conducts substantial business within this district and Plaintiffs acquired, maintained, and repaired their Honda vehicles in this district.   AHM's representations and

omissions were made in this district and occurred through AHM's authorized dealerships located within this district.

11.     AHM is warrantor under the Honda New Vehicle Limited Warranty ("NVLW") distributed with Plaintiffs' and the proposed class members' Honda vehicles at the time of sale or lease.

12.     AHM operates and maintains a support line for service technicians at AHM's authorized dealership service centers.  AHM monitors this support line to identify market quality issues with specific Honda vehicles or parts.

13.     AHM sells and distributes OEM and repair/replacement parts from various suppliers to authorized Honda dealerships, including parts used to fix vehicles brought in after sale or lease for repair.

## GENERAL FACTUAL ALLEGATIONS

14.     AHM engaged in deceptive and/or unfair practices under the ICFA when it: (a) failed to warn its vehicle consumers of the safety hazard and unexpected expense that could result from a rodent chewing through vehicle wiring; (b) knew that rodent wire damage had caused serious vehicle malfunctions based upon reports from its authorized dealership service centers and its own customer relations management software and support line for service technicians; (c) knew from its wire harness suppliers that rodents would be deterred from chewing wiring that was pre-wrapped in rodent deterrent tape; (d) knew that specific wire harnesses were more attractive to rodents and more likely to be chewed but also, knew that rodent access to the engine compartment and these specific subharnesses was a widespread market problem; and (e) nonetheless, had directed certain (but not all) suppliers to pre-wrap only a knock sensor harness in limited select

models with rodent deterrent tape, despite other harnesses being of similar exposure and similar danger of being chewed.

15.    AHM engaged in deceptive and/or unfair practices under the ICFA when it failed to warn consumers of the known safety hazard described above even though AHM knew that: (a) when rodent damage to wires occurred, AHM would consider the matter an "act of nature" so that it would not be deemed a warrantable repair; (b) it sold "Honda 4019-2317 Rodent Tape" ("Rodent Tape") and recommended consumers purchase Rodent Tape to cover the wiring but only after the vehicle was in for a non-warranted repair; and (c) rejected warranty coverage for the repairs.

16.    When rodents eat through the wire harnesses which are associated with the vehicle's power steering system, the wires are exposed and damaged, ultimately resulting in vehicle malfunctions, check engine light illumination, and in some instances, a total loss of power steering.

17.    AHM's Rodent Tape is designed to safely wrap around engine compartment vehicle wiring as extra wire insulation and is made with a proprietary blend of spicy flavorings that AHM claims will deter rodents.  However, disclosure of the consumer's need for Rodent Tape is only made after the vehicle is sold, malfunctions, brought in for repairs, and AHM denies warranty coverage.

18.    AHM has unfairly refused to warrant its vehicles when rodent damage occurs and declines coverage for the required repairs and/or replacement parts, deeming the damage an "act of nature" that is expressly excluded under its warranty.  However, a rodent or other animal being able to access critical wiring components to chew, ultimately causing damage to the vehicles is not an "act of nature" as that term is commonly defined (i.e., "An extraordinary and unexpected natural event, such as hurricane, tornado, earthquake, fire, flood which results in damage

4

to assets.")  AHM possessed frequent reports of rodent chewing incidents, its parent company had engaged in countermeasure analysis and study, and AHM had even paid dealerships warranty funds for rodent-damaged vehicles.

19.     AHM fails to disclose at the time of sale that Honda vehicle wire harnesses are known to be susceptible to rodent attack and should be covered in Rodent Tape to deter chewing and protect critical vehicle wiring under the front hood.  AHM also fails to disclose at the time of sale that any wire harness repair or replacement required due to rodent damage will never be covered under warranty because AHM incorrectly deems it an "act of nature."

20.     AHM fails to disclose at the time of sale that failure to deter rodents can cause both a vehicle safety hazard to emerge and unexpected additional costs to the consumer.

## FACTUAL ALLEGATIONS REGARDING PRESTON AND TURGEON'S VEHICLE ACQUISITION AND REPAIR

21.     On or about June 23, 2015, Plaintiff Michael Preston leased a 2015 Honda Accord, VIN 1HGCR2F80FA203311, at Muller Honda in Highland Park, Illinois for an agreed upon price of $25,381.28, inclusive of all collateral charges.

22.     Preston obtained his Accord for general personal, family and household use.

23.     Preston viewed materials at the dealership that promoted AHM's 3-year/36,000 mile NVLW.  These materials included a vehicle window sticker, dealership signage, and paperwork included in his deal jacket.

24.     Preston relied on AHM's NVLW – and the absence of any warning regarding rodent incidents – as an assurance of quality and promise that covered parts would be protected by the warranty.  In fact, Preston relied on AHM's written statements regarding the length and duration of the NVLW when deciding to purchase the subject vehicle.  Preston also relied on Defendant's written statements that every new Honda vehicle was covered by the NVLW

(excepting the tires, which are separately warranted by the tire manufacturer), meaning that the wire harnesses associated with the vehicle's power steering system and contained within the engine compartment are covered parts.

25.     In November of 2016, within the 3-year/36,000 mile AHM NVLW period, Preston's Accord lost power steering.

26.     Preston's Accord was brought back to Muller Honda for service.

27.     On or about November 8, 2016, Muller Honda provided Preston with a repair invoice totaling $2146.16. Muller Honda advised Preston that power steering components had been chewed through by a rodent and the power steering rack had to be replaced:



28.     Muller Honda informed Preston that AHM would not cover the repairs under the NVLW.  Instead, AHM's authorized dealership representatives advised Preston he should make an insurance claim, which Preston did, forcing him to incur a $500.00 deductible.

29.     On or about May 10, 2017, Plaintiff Penelope Turgeon leased a 2017 Honda Civic Hatchback, VIN SHHFK7H23HU221574, at Fletcher Jones Honda in Berwyn, Illinois for an agreed upon price of $19,127.21.

30.     Turgeon obtained her Civic for general personal, family, and household use.

31.     Turgeon viewed materials at the dealership that promoted AHM's 3-year/36,000 mile NVLW.  These materials included a vehicle window sticker, dealership signage, and paperwork included in her deal jacket.

32.     Turgeon relied on AHM's NVLW – and the absence of any warning regarding rodent incidents – as an assurance of quality and promise that covered parts would be protected by the warranty.  In fact, Turgeon relied on AHM's written statements regarding the length and duration of the NVLW when deciding to purchase the subject vehicle.  Turgeon also relied on Defendant's written statements that every new Honda vehicle was covered by the NVLW (excepting the tires, which are separately warranted by the tire manufacturer), meaning that the wire harnesses associated with the vehicle's power steering system and contained within the engine compartment are covered parts.

33.     In July of 2017, within the 3-year/36,000 mile AHM NVLW period and only two months after bringing her new vehicle home, Turgeon's Civic lost power steering.

34.     Turgeon's Civic was brought to back to Fletcher Jones Honda for service.

35.     On or about July 14, 2017, Fletcher Jones Honda informed Turgeon there was major damage to the Civic's EPS harness, caused by bare wires that had been chewed through by a rodent, as depicted below:



36. Fletcher Jones Honda informed Turgeon that AHM would not cover the repairs under the NVLW, causing her to incur charges totaling $313.28. Fletcher Jones covered the replaced power steering wiring harness with Honda Part 4019-2317 ("Rodent Tape") and replaced the power steering sub harness:

```
16 REPLACED EPS SUB HARNESS
2017 CP 232.50 232.50
1 53682-TBA-A01 HARNESS 30.07 30.07 30.07
1 53680-TBA-A00 HARNESS, EPS 17.62 17.62 17.62
PARTS: 47.69 LABOR: 232.50 OTHER: 0.00 TOTAL LINE A: 280.19
```

37. Less than 2 weeks later, on or about July 24, 2017, Turgeon experienced another total loss of power steering. The vehicle was towed back to Fletcher Jones and the service center discovered the wires were re-exposed, and the EPS sub harness needed to be replaced for a second time, as depicted below:



```
1 53682-TBA-A01 HARNESS                    30.07    30.07
   30.07
1 4019-2317 TAPE,RODENT 19MM 20M           46.31    46.31
   46.31
PARTS:       76.38  LABOR:    232.50  OTHER:       0.00
TOTAL LINE A:    308.88
1278 FOUND POWER STEERING GEAR BOX WIRE HARNESS DAMAGED BY RODENTS.
```

1.50 WRAP NEW WIRE HARNESS WITH RODENTS RESISTANCE TAPE AND INSTALLED
ON THE GEAR BOX

38.    Once again, Fletcher Jones informed Turgeon the repairs were not covered under the NVLW, causing Turgeon to pay another $163.87 (after insurance covered the remaining portion), including $46.31 for Fletcher Jones to apply more Rodent Tape.

39.    The wire harnesses associated with Preston and Turgeon's power steering system are covered components under the AHM NVLW, but AHM omitted informing Preston and Turgeon prior to purchase that such wire harnesses were attractive and accessible to rodents.  In fact, any resulting damage caused by rodents chewing would always be excluded from warranty coverage.

40.    Preston and Turgeon became aware that multiple other Honda vehicles were chewed in the same manner as theirs and that AHM's universal policy was to deny warranty coverage, even though the NVLW covers power steering components and there was no warning regarding the high incidence rates of rodent damage to that component's wiring.

41.    The rodent damage and required attendant repairs substantially impaired the Plaintiffs' vehicles' use and value.

42.    AHM's NVLW contains an exclusion for "acts of nature" but no statement that such exclusion applies to rodent incidents.  AHM does not define what it means by "acts of nature" in its General Warranty Provisions.  Among the definitions one can find, none encompass AHM's position, which is to claim an event that is well known is somehow unpredictable. AHM knows where rodents nest and chew, knows where rodents are able to enter the engine compartment through known, specific access points, and knows there are specific types of harnesses that are more susceptible to chewing.  Compare, e.g., 2019 WebFinance, Inc. Business Dictionary, "Inevitable, unpredictable, and unreasonably severe event caused by natural forces without any

9

human interference, and over which an insured party has no control, such as an earthquake, flood, hurricane, lightning, snowstorm;" Wikipedia, "Natural disaster, generally. A legal term used in contracts, synonymous with the legal term an act of God." AHM's warranty provides no other definition of the term to explain it includes rodents eating through wire harnesses AHM knows are commonly chewed.

43. Plaintiffs' complaints are substantially similar or materially identical to the complaints of other Honda vehicle owners.

44. Hundreds of Honda vehicle owners called AHM directly to complain about expensive repairs caused by rodent damage.

45. Plaintiffs were financially damaged due to AHM's conduct and class members with Honda vehicles still in their possession are at continued risk for future damage.

46. As a direct and proximate result of AHM's failure to comply with its obligation to disclose material facts regarding its vehicles prior to sale, Plaintiffs have suffered damages and, in accordance with 815 ILCS § 505/2, Plaintiffs are entitled to bring suit for such damages and other legal and equitable relief.

## **CLASS ALLEGATIONS**

47. Plaintiffs bring this action individually and on behalf of a class.

48. This case is appropriate for class action treatment because Plaintiffs' vehicles contained wire harnesses associated with their power steering gear boxes which, when chewed by rodents, are known to compromise the power steering system and lead to power steering failures. AHM's universal policy was to deny repair and replacement of these wire harnesses under the NVLW if rodent damage was evident, even though AHM knew the harnesses were susceptible to

rodent attack, easily accessible, and could have been better insulated, coated or taped to protect the wiring.

49.    The class is defined as all persons in the State of Illinois who purchased or leased 2014 – 2017 Honda Accords or Honda Civics.

50.    A class action is permitted and preferable in this case because the class is so numerous that joinder of all members is impractical.

51.    A class action is permitted and preferable in this case because there are questions of law and fact common to the classes that predominate over any questions affecting only individual class members.  These principal questions include whether Defendant violated the ICFA by: (a) omitting or concealing material facts about the Civic and Accord power steering gearbox wire harness defects (due to their vulnerability to rodents and resulting safety concerns and unexpected repair costs); (b) omitting or concealing the material fact that this common rodent damage occurrence would not be covered by the NVLW at the time of sale; and (c) deeming the rodent damage occurrence an "act of nature" and advising consumers in need of repair as such when it is not commonly considered an "act of nature."

52.    Common questions also include: (a) whether the common occurrence of rodent damage is a material fact such that AHM had a legal obligation to disclose to consumers that their engine compartment wire harnesses and sub-harnesses should be covered in Rodent Tape to withstand normal use (such as parking in their garages and driveways); (b) whether AHM had a duty to warn that said wire harnesses may be chewed through, since rodent incidents had caused numerous other similar model vehicles to malfunction during normal use; (c) whether AHM had a duty to warn that repairs needed due to rodent damage to wire harnesses are not covered under warranty and as such, AHM should have defined its purported warranty exclusion upfront; (d)

11

whether AHM committed unfair acts in violation of state and federal public policy by refusing to repair/replace chewed wire harnesses and/or installing/re-installing wire harnesses without rodent deterrent countermeasures in place; and (e) whether AHM unfairly refused to repair parts and breakdowns without pre-sale notice to consumers.

53.     Plaintiffs' claims are typical of the claims for all class members, as they arise from the same operative facts and are predicated on the same legal theories.

54.     There are no individual questions of fact, other than whether a class member purchased or leased a class vehicle, which can be determined by a ministerial inspection of Defendant's records.

55.     Plaintiffs will fairly and adequately protect the interests of the class members. Plaintiffs are committed to vigorously prosecuting this matter and have retained counsel experienced in handling class actions and unfair business practices claims. Neither Plaintiffs nor counsel for Plaintiffs have any interests that might cause them to not vigorously pursue this claim.

56.     This action should be maintained as a class action as the prosecution of separate actions by individual class members would create a substantial risk of inconsistent or varying adjudications with respect to individual class members. Furthermore, the prosecution of separate actions could result in adjudications of individual members' claims that could be dispositive of the interests of other members not parties to the adjudications or could substantially impair and/or impede the ability of such individuals to protect their interests.

57.     A class action is a superior method for the fair and efficient adjudication of this controversy. There is interest in the class members to determine a uniform diminished value or reimbursed repair costs for their vehicles and forcing class members to litigate their claims individually against AHM is economically impracticable.

12

## COUNT I -- VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD
## AND DECEPTIVE BUSINESS PRACTICES ACT

58.    Plaintiffs reincorporate all preceding paragraphs as if set forth fully in this Count.

59.    The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") states

in relevant part:

> Sec. 2. Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965 [815 ILCS 510/2], in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5 (a) of the Federal Trade Commission Act.

815 ILCS 805/2.

60.    Plaintiffs and all proposed class members are protected by the ICFA in that they

are "consumers," defined as, "any person who purchases or contracts for the purchase of

merchandise not for resale in the ordinary course of his trade or business but for his use or that of

a member of his household." 815 ILCS 505/1e.

61.    AHM's distribution of the class vehicles occurred within the course of Illinois trade

or commerce as, "[t]he terms "trade" and "commerce" mean the advertising, offering for sale, sale,

or distribution of any services and any property, tangible or intangible, real, personal or mixed,

and any other article, commodity, or thing of value wherever situated, and shall include any trade

or commerce directly or indirectly affecting the people of this State." 815 ILCS 505/1f.

62.    AHM committed the following unfair acts, among others, in violation of 815 ILCS

505/2:

13

A)      Prior to the sale of the class vehicles, AHM received multiple complaints and repair requests involving chewed-through wire harnesses connected to or contained within Honda vehicles' engine compartments and specifically, associated with the power steering gearbox.  AHM knew, based upon previous studies and tests performed, that certain subharnesses were attractive to rodents for chewing, and that its engine compartment provided access points for rodents to nest and chew.  In fact, AHM ordered that certain subharnesses be wrapped in Rodent Tape as part of the mass production of specific Honda vehicles due to rodent accessibility concerns and rodent testing that had been performed on specific wire harnesses.

B)      Despite AHM's knowledge based on consumer complaints, repair requests, and previously performed studies and tests, AHM continued to do nothing to protect the class vehicles' wiring prior to purchase and continued its company protocol to refuse repair or replacement of the defective parts.

C)      AHM omitted telling consumers prior to purchase or lease that it would not cover repairs caused by its own failure to protect vulnerable wiring under its express warranty, citing its undefined "act of nature" exclusion.

D)      AHM omitted telling consumers prior to purchase or lease that they could use Honda Part No. 4019-2317 Rodent Tape to deter rodents and avoid expensive repairs.

E)      AHM omitted telling consumers prior to purchase or lease that they would be responsible for their own costs associated with vehicular damage caused by rodent attacks when AHM knew its vehicles' wire harnesses should be "extra-coated" with Rodent Tape.

F)      AHM unfairly refused to repair damage caused by rodent attacks by misrepresenting that said attacks were disqualified from coverage as an "act of nature," even

14

though such term is not defined in the NVLW and the ordinary definition of the term does not apply to these expected, known, and studied events.

63.     The class vehicles were all sold with a NVLW warranty for 3 years or 36,000 miles. The NVLW warranty guarantees that the vehicle will be free from defect in parts and workmanship, such that if there is a malfunction of any covered part, AHM will fix the vehicle and/or replace the part, free of charge.

64.     A new vehicle warranty is an important incentive for any purchaser or lessor of a new vehicle in the United States. AHM touts that its vehicles are the safest, most reliable, and the most trustworthy, and AHM provides its warranty as a means of conveying that trust.  The NVLW is AHM's way of telling the public that they can trust the vehicle, because AHM stands by it, and will back its word with free repairs.

65.     AHM uses no other means of selling its vehicles to consumers than through its authorized Honda automobile dealerships. While these dealerships are not specifically owned by AHM, AHM provides dealership training for the sale of its vehicles, provides training for the repair of its vehicles, monitors the vehicles once they are sold and on the road through its Market Quality department, and provides marketing and advertising materials to its authorized dealerships. Moreover, AHM's logo is placed throughout selling dealerships and in the dealership's repair facilities such that a customer entering a dealership or repair facility would make no mistake as to which company backs the warranty and the vehicles' parts and workmanship.

66.     AHM places brochures, flyers, and other written marketing materials throughout its authorized dealerships. These marketing materials tout the 3 year/36,000 mile NVLW and the safety and reliability of new Honda vehicles regarding breakdowns or malfunctions.  AHM

15

authorizes stickers and decals to be placed on the Honda vehicles offered for sale or lease which promise that the vehicle is covered for mechanical breakdowns for 3 years or 36,000 miles.

67.     AHM approved "window decals" (commonly referred to as a Monroney sticker) for placement on Honda vehicles to be viewed prior to purchase.

68.     These decals advertised the 3-year/36,000 mile warranty term but without specifics as to the warranty's limitations.

69.     Information regarding AHM's NVLW promise is also contained within the deal jacket documents provided to consumers as part of their sale and lease transactions and the AHM warranty booklet is provided to consumers upon delivery of their new vehicles.

70.     As part of their vehicle transactions, Plaintiffs did in fact see, view, and rely upon the above-described marketing and purchase/lease materials that touted AHM's reliability and promised coverage in case of a breakdown or defective part or workmanship.

71.     Prior to the vehicle transactions involving Plaintiffs and the class members, AHM knew that engine compartment room wiring harnesses and subharnesses, including those which carry and are associated with power steering function, were vulnerable to rodent damage and able to be chewed through.

72.     Once the rodents gain access to the engine compartment through known entry points, the wire harnesses are chewed by rodents.  The chewing damages the harness and/or sub-harness which is supposed to protect the wire itself, ultimately causing the vehicle to lose power steering and the check engine light and other warning system lights to illuminate.

73.     The sudden loss of power or inability and difficulty in operating the steering of a vehicle while on the roadway presents a risk of harm and bodily injury to those in the vehicle or other vehicles on the roadway.

16

74. A rodent attack upon wire harnesses that impact power steering control and therefore, cause serious vehicle malfunctions is not a foreseeable event by consumers. Consumers generally are not aware that this is a common occurrence, whereas AHM is.

75. Prior to Plaintiffs' and the class members' vehicle transactions, AHM failed to disclose how rodent damage was not covered by the NVLW and omitted telling consumers that their vehicle wire harnesses had a critical vulnerability.

76. Prior to Plaintiffs' and the class members' vehicle transactions, AHM was aware that thousands of drivers had complained of rodent damage but still failed to disclose to consumers that they should take action to protect wire harnesses from damage because necessary repairs would not be covered under warranty.

77. Instead, AHM made the company-wide business decision to deny any and all such claims under its NVLW and to not better insulate the vulnerable wiring.

78. AHM's service facilities were instructed to advise consumers seeking repair of this specific problem that this was not covered because, (a) it was considered an act of nature, or (b) the wire harnesses and subharnesses are not considered defective in parts or workmanship.

79. While denying warranty claims, AHM began profiting from the repairs it forced consumers to pay for, selling a means to repair and insulate vulnerable wire harnesses.

80. AHM acquired the right to sell "Rodent Tape," a tape deemed safe for engine compartment wiring that is laced with an ingredient called capsaicin (a strong pepper that rodents evidently dislike based on performed studies). AHM sold the Rodent Tape to Honda service facilities, required certain suppliers to use it, and instructed Honda service facilities to implement Rodent Tape as a repair measure once consumers presented with rodent damage. However, AHM

did not instruct dealerships to promote Rodent Tape as a preventative measure to be applied before any damage occurred at the time of sale.

81. AHM did not, at any time or in any way prior to the sale of the vehicles to the Plaintiffs and the class, advise consumers that rodents were known to be able to enter the engine compartment and chew wire harnesses, thereby causing a malfunction not covered by the advertised warranty.

82. Rather, AHM, knowing that its vehicles are susceptible to rodent attacks, knowing that it will not cover malfunctions caused by these rodent attacks under its warranty, and knowing that it possesses Rodent Tape that could be a preventative measure from these attacks, continues to omit these facts from consumers at any time before or during the sales process.

83. The following are material facts that would cause a consumer to either opt to purchase a different vehicle, negotiate a Rodent Tape application prior to delivery, or consider other available rodent countermeasures: (a) Honda vehicle wire harnesses are susceptible to rodent attacks and specific harnesses have been studied and determined to be "particularly attractive" to rodents; (b) a rodent-chewed wire harness will cause the vehicle to malfunction; (c) AHM will disclaim all liability for the vehicle malfunction and will not agree to repair or replace the chewed harness under the NVLW; (d) Rodent Tape was studied and found to be an effective tool for rodent deterrence, when properly applied, and as a preventative measure to avoid wire damage.

84. This is not a simple breach of warranty claim because AHM engaged in a widespread, systematic practice of engaging in unfair conduct by omission. Even though AHM knew rodent damage claims would never be covered, it did not inform consumers of this prior to sale and at the time of delivery of the NVLW. Further, AHM advised its dealerships how to use Rodent Tape to deter rodents but simultaneously required that its dealerships log such repair as not

covered under warranty. AHM also charged dealerships for the Rodent Tape and the dealerships, in turn, passed the tape and application costs on to the consumer. Ultimately, AHM profited from the sale of Rodent Tape, rather than incur the cost of warranty claims or a countermeasure to prevent rodent damage in the first place.

85.     AHM's failure to cover the repair expense for this known defect has a widespread effect on consumers and implicates general consumer protection concerns. AHM's vehicle defect can and has caused consumer purchasers to incur thousands of dollars in repair costs, insurance deductibles or worse, increased insurance premiums, and diminished trade-in or resale value. Consumers also experience loss of use of their vehicles during repair times.

86.     The fact that the vehicle contains a defect that could render a vehicle inoperable is a material fact, and consumers would not have purchased or leased the vehicles as is had they been informed that, (a) the vehicle wire harnesses associated with power steering function were able to be accessed and chewed through by rodents, (b) rodents were less likely to chew through wire harnesses pre-wrapped in Rodent Tape, and (c) necessary repair or replacement of the defective wire harness was excluded from warranty coverage.

87.     AHM's conduct causes and has the potential to continue to cause substantial harm to consumers and generally implicates consumer protection concerns. Sudden loss of power steering presents a safety issue on the roadway. Because the vehicle's power steering system is responsible for making the steering wheel responsive and easier to turn, the loss of power steering can be dangerous, especially if the consumer has never driven without power steering before.

88.     At the time the vehicles were leased or sold to the Plaintiff and the class members, AHM knew that a vehicle condition existed whereby its engine compartment wire harnesses were easily accessible to rodents and susceptible to being completely chewed through. AHM

nonetheless failed to advise consumers that it would not cover necessary repairs under warranty and further, failed to advise consumers that a known safety hazard was present, even while: (a) otherwise representing that its warranty would cover all defects and nonconformities in the vehicle; and (b) providing seemingly otherwise exhaustive vehicle safety reminders and information.

89.     But for AHM's unfair acts, Plaintiffs and the class members could have decided to protect their vehicles before a rodent incident, perform research as to rodent-related complaints and select another vehicle, or take additional precautions. AHM's unfair conduct further causes consumers to be deprived of necessary vehicle safety and reliability information.

90.     AHM knows about the problem, asks consumers to pay for the problem, and distributed vehicles for sale or lease without addressing the problem, even while promoting protection it knew did not exist under its NVLW, a violation of Illinois public policy.

91.     AHM's unfair conduct was done with the intent that Plaintiffs and the class members would rely on AHM's safety and quality assurances and the terms of the NVLW when purchasing or leasing their vehicles. Defendant knew that Plaintiff and the class members may not have purchased or leased their vehicles or at minimum, would have purchased Rodent Tape or otherwise protected their wire harnesses against rodent attacks.

92.     Defendant's actions implicate consumer protection concerns, are immoral, unethical or unscrupulous, and violate public policy.

93.     As noted in Section 2 of the ICFA, practices that violate the Uniform Deceptive Trade Practices Act are violations of the ICFA. The Uniform Deceptive Trade Practices Act states: (a) A person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person: (5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a

person has a sponsorship, approval, status, affiliation, or connection that he or she does not have; (7) represents that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another.

WHEREFORE, pursuant to 815 ILCS 505/10, Plaintiffs pray for relief against Defendant for its violations of the Illinois Consumer Fraud and Deceptive Business Practices Act and requests actual damages, punitive damages, injunctive or other equitable relief to which Plaintiffs and the members of any certified class may be entitled, all attorney fees, expert fees and court costs incurred during the commencement and prosecution of this matter, and all other relief deemed just and appropriate by this Court.

Respectfully submitted,

By: ___/s/ Stacy M. Bardo_____
Attorney for Plaintiffs

Dated: April 12, 2022

Larry P. Smith
SMITHMARCO, P.C.
55 W. Monroe Street, Suite 1200
Chicago, IL 60603
Telephone:     (312) 324-3532
Facsimile:     (888) 418-1277
E-Mail:        lsmith@smithmarco.com

Stacy M. Bardo
Bardo Law, P.C.
22 West Washington Street, Suite 1500
Chicago, Illinois 60602
Telephone:     (312) 219-6980
Facsimile:     (312) 219-6981
E-Mail:        stacy@bardolawpc.com